Good morning, Counsel. Good morning, Your Honor. May it please the Court, my name is Carl Post. I'm here on behalf of Mr. Updike, the plaintiff, and the appellant in this matter. The subject matter of this case is the violation of the ADA and Rehabilitation Act, which requires public entities to act affirmatively to evaluate the programs and services they offer and to ensure that people with disabilities have meaningful access to those services. That was not done in this case. Some important things to remember is both of those statutes provide actions that the public entities have to take. And one of the most important ones is that they do have to act affirmatively, and that was discussed in the Pierce case. But they have to take steps to evaluate what accommodations the person with a disability actually needs. And there's no requirement for the person with a disability to actually request an accommodation. Counsel, Judge Gould, if I could interject. Certainly. I realize you might not have a good picture there. Can you probably hear me? I can hear you. My question is, how many times did your client, Updike, ask the county officials to provide him with an ASL person to interpret? And also, is that ASL really his primary language? ASL is Mr. Updike's primary language. It's important to note that ASL is a distinct language from English. I think a lot of people think that it's part of the English language or some aspect of the English language. It's just like Spanish, Italian, etc. It's a separate language on its own. And I apologize, I don't have the exact count of the number of times that he requested an ASL interpreter, but it was on numerous occasions at different stages. He requested it in the booking, he requested it with the nurse, he requested it with the reconnaissance officer, and he requested it for the pretrial supervision aspect of the case also. So it wasn't just one instance. It was, I mean, rough guess, I would say at least ten times that he requested an ASL interpreter, and it was denied every time. Even the reconnaissance officer admitted that Updike required an ASL interpreter, and that he's never provided one to anyone. And that's just... Okay, counsel, thank you. You've answered my question. Thank you. Counsel, I'm trying to get a handle on which allegations were made in the complaint as opposed to the ones that are included in the brief. So would you please clarify which allegations that you are arguing about today that were actually set forth in the complaint? Well, can I grab a second? Of course. Of course. Okay. We did set this out in our brief, I believe it was. Actually, it seemed to me when comparing the argument in the brief against the complaint that there were some in the brief that were not a complaint. Because for instance, the closed captioning on the TV, did you make that allegation in the complaint? Specifically, I'm not sure. Certainly we have the ASL interpreter and TTY machine in paragraph 20. What about the inability to communicate with the nurse? Where is that in the complaint? I mean, I will note that our, that is our position that every single allegation of how they violated the statute is a requirement under the notice of the union. Well, but they have to have some ability to be able to defend against the allegations without knowing specifically which ones they are at some point in the litigation. Well, yeah, they have the opportunity at the deposition to ask their client what specific instances he's alleging. Well, at the deposition, did you talk about the closed captioning and inability to communicate with the nurse? I'm not aware if FootPost also asked him those questions. And so we have the, we certainly have the general allegations that he was deprived of services, the inability to communicate effectively. And I'm not aware of a case that says you have to put every exact way that they failed to provide an accommodation. Well, you have to put that on notice efficiently to know what to defend. Because if you don't tell them that it was with the nurse, they wouldn't know to contact the nurse to ask her what happened. So you don't have to put every single allegation. And there has to be some kind of notice as to what exactly their exposure is. Well, regarding the nurse, I do believe that was discussed at the deposition. I think we cited it in our brief, but I don't have the precise. To me, the complaint was limited primarily to the court appearance. To me, that's what was fairly indicated as being the primary cause of action, that the ASL was not supplied in order to make the appearance in court effective. To me, that seemed to be the gist of the complaint. No, again, in paragraph 20, it's on the record, page 275. We specifically state that he was not provided an ASL interpreter at the Multnomah County Detention Center, and that he requested a TTY machine there and was not provided a TTY machine during his stay at that facility. Okay, so if you add those to the allegations, that still doesn't talk about closed captioning on TV or ability to communicate with the nurse. But anyways, those are just my concerns. You can go ahead. All right. And I was just going to ask, are you still seeking injunctive relief? Yes, Your Honor. I have two questions. And one, injunctive relief of what kind? And two, I think Judge Simon concluded that he didn't have standing, right, seeking injunctive relief. What's your response to that? That was Judge Simon's ruling. If I could just go back to the page 288 of the record, it has more allegations on the complaint. Regarding the standing, we believe that Hodger's Durgan case is on point here. Hodger's Durgan is from the Ninth Circuit, and there the plaintiffs were pulled over due to their race. Part of Judge Simon's ruling was based on the fact that he said it's extremely hypothetical that Mr. Updike would be arrested again. That would require him to break the law to do so. That's not the case. Mr. Updike didn't violate the law in this case, and he was arrested. The reason he was taken downtown was from the initial failure to provide accommodations for him and communicate effectively with him at his home. And he was arrested. And it's important to note, all charges were ultimately dropped against him. Your question is, I don't think it makes any difference. The question is, how likely is it that he would be confronted with that same situation again? Well, as the jury. There's no showing that he's likely to be confronted with it again, is there? Well, the jury court points out that you can look at also the number of times that someone's been arrested in the past on whether or not they will encounter the police again and have a similar scenario. And there. And he's, so to speak, in the favor, right? He is colored, yes. He's in our favor. He's got a good record on that. He does, yeah. And so I do think the Demery case is on point. They're discussing mootness in that case, but it's the capable of repetition, which is part of the standing analysis that you have to look at whether or not this is going to reasonably occur in the future. Also, apart from injunction, does your client also have damage claims relating to failure to give him an ASL interpreter or TTY machine? Yes, he's got compensatory damages for those violations. What are the damages? What are the compensatory damages? The amount of the damages. What's the nature of the damages? Well, it would be, I guess, most emotional distress damages. He also had damages of being detained in jail longer because he wasn't able to call his attorney. That's one aspect of his claim. If he would have been able to call an attorney right away, the attorney could have assisted in several things. One, talking to the officer in charge of releasing him, Mr. Updike had a zero risk factor, and there was no reason to keep him in jail until the arraignment. He should have just kept released. That didn't happen due to lack of communication with Mr. Updike. Calling an attorney would have remedied that. Second, the attorney could have assured that an interpreter was available at the first arraignment, and Mr. Updike would have been released on that day in jail, and it's been mentioned that that's trivial, and I guess maybe people that think spending extra time in jail have never been there because it's certainly not trivial for Mr. Updike to spend more time than is required by the law and necessary to resolve these charges that were ultimately drawn from him. Well, you didn't put a certain amount in your complaint, or the complaint does not contain specific amounts being requested. Yeah, I'm not aware of the requirements. No, I didn't ask if there was a requirement. I'm just saying that's why we did it. Yeah, I know. Sometimes people do. I'm just asking you if there was not an amount in the complaint that was requested. I believe that's correct. It would be, I guess, on the civil cover sheet does require an estimate of damages. You don't remember what was put on there? No, I didn't draft the original complaint. I just said the cover sheet. Can I also interject a question, please? Yes. What's the best case you have that would say that for a deaf person, having an ASL interpreter is essential in the same sense that if you had a criminal defendant or accused person who only speaks Spanish, they would be able to give a Spanish interpreter? So what's your best case that says for a deaf person that really ASL should be good as their primary language? Well, I think what you're getting at is the effectiveness of what was provided to them versus what was requested. And I'm just making sure I understand the question. So I believe it's Duffy V. Maybe there's no case that's such on this. I don't really know, but that's one of the things I wanted to find out. Duffy V. Riveland specifically states that the effectiveness of the auxiliary aids that were provided versus what's requested is a question of fact that generally precludes summary judgment. So I definitely think that's one of our best cases because the defense here is they're saying we provided him a pen and paper at some point, and that was effective communication, and therefore we didn't deny him anything. Right. So what I was trying to find out was because the detention center didn't seem to feel that they have any obligation to give him an ASL interpreter, was there any Ninth Circuit case that's ever said that a deaf person who's dragged into the criminal process should be given an ASL interpreter? The courts don't discuss that. Again, the Duffy case is from the Ninth Circuit, and that's the issue of what accommodation is effective. Sometimes writing can be effective, but there's a question of fact here of whether providing pen and paper was effective for Mr. Hupdyke. It was not. That's a question for the jury to decide whether they believe Mr. Hupdyke or the defendants. And so it is the Duffy case and also Button V. Board of Regents where it says denial of a request of accommodation without investigation is sufficient to survive summary judgment. They didn't do an investigation on what Mr. Hupdyke needed. They ignored his request and provided their accommodations to him, and that's what they provided. All right. Thank you. Good morning. Thank you for the court. I'm Jacquelyn Keemans on behalf of the Multnomah County defendants. I'd like to take ten minutes with my argument and reserve five minutes for Mr. Shaw to address the issue of the provision of an ASL interpreter in the case of Mr. Hupdyke's arraignment. As far as Mr. Hupdyke's time in county custody, the court did affirm the district court's decision for two reasons. The first one is that the claims that an appellate now alleges are just not within the operative's meaning and they're not properly before this court. The record is undeveloped on the eminent reports. It's basically impossible to make a decision. So in the operative complaint, didn't he complain that the detention center didn't provide him an ASL interpreter on request? There are a few oblique references to ASL interpreter, but they're entirely in the context of what was essentially what this case was about. When this case was brought, it was about the extra day that Mr. Hupdyke had to spend in jail because of the provision of the delay in receiving an ASL interpreter at his arraignment, as well as his interactions with the Gresham Police Department. And the mentions of ASL interpreter in the complaint relate to his inability to communicate with the Gresham Police Department. In the reply brief, appellant cites paragraphs 20, 37, 39, and 77 of the complaint as the source for all of the allegations against Multnomah County defendants. He said 20, 37, 39, what else? 77. And that's on page one of the reply brief. It's important to note at the outset, none of those four paragraphs mention things like closed captioning on the television, an inability to provide video relay service, taking of paper and pen, but the litany of allegations that are contained in briefing at this point, and that were contained in the response to the county's motion for summary judgment, but specific to TTY and ASL, which are mentioned. They are mentioned in the context of communications with, during booking and at the Gresham Police Department. On paragraph 20, it states, on January 14, 2013, the defendant and city's police officers took a plaintiff to defendant Multnomah County's Justice Center for booking. Plaintiff requested an ASL interpreter, but none was provided. Plaintiff also requested a text telephone, TTY, and telecommunications device for their desk. Plaintiff was made to wait several hours. Finally, a corrections officer told plaintiff that they could not find a TTY. Defending Gresham police officers directed plaintiff to write out a statement of what occurred between plaintiff and McEvoy, the victim, without the accommodation of a TTY or an ASL interpreter. The connection there is the ASL interpreter is directly connected to Mr. Updike's alleged inability to communicate properly with Gresham Police Department. And it's also important to note that it's just at booking, and it's for a few hours. And later references to TTY also say failure to promptly provide TTY. It's now morphed into, while he was in a different facility, after booking, he was provided a TTY. There's now allegations that had he received this TTY, he would have contacted a lawyer and not been in jail as long. And not only is that not in the complaint, that's not on the record. There's no evidence. Correct, Your Honor, that does go to the measure of damages. The specific allocation about what he would have done with the TTY that he has now put before this court is not in the complaint. And as the point I was making regarding the ability to commentary that he's arguing now, that's not in the record either. There's no evidence that Mr. Updike testified he would have done that had he not been given the opportunity. Judge, did she have any trouble hearing you? So I wonder if your mic needs to be moved, though. Sorry about that. Counsel, what do we do with the fact that the district court addressed the issues that were not in the complaint? The fact that the district court addressed them, doesn't it cure any lack of discussion of those in the complaint? Your Honor, I don't believe it does. And the main reason is because the record at this point is on 2012. The county defendants did not put in any evidence regarding the vast majority of those claims. Specifically, Mr. Updike claims in his declaration that he asked for an ASL interpreter on numerous occasions. That's disputed in the record. But the county defendants did put on sufficient evidence of that because it wasn't in the complaint. Similarly, there's no information as to proposed captioning on the television. There's no information in the record to draw a conclusion about most of these claims. Now, the fact that the district court addressed them, I think there is enough information in the record for the district court to reach the conclusion that it did. And that's because there is no evidence of deliberate indifference on the part of the Multnomah County defendants. The county employees were under the reasonable belief that the auxiliary aid that they did provide, which was a pen and paper to exchange notes, was effective. And if they're under that belief, if there's reason to believe that it's effective, they did not be deliberately indifferent. But if the plaintiff specifically asked for ASL interpretation, is the belief reasonable that pen and paper is sufficient? And if ASL is a different language than English, how is that reasonable? Well, in the implementing regulations for the ADA, Section 35-104, note communication by notes is identified as an auxiliary aid that can be effective communication. The regulations further clarify that it depends on the circumstances. It depends on the complexity of the communication, the number of people involved. These types of distinctions, like in Duffy, in Duffy the case, it mattered more because it was a disciplinary hearing, but he needed an ASL interpreter for it. Here what we're talking about is the booking process, which is essentially a handful of yes-no questions. And yes, they're asked by a few different people, a classification deputy, a booking officer, a recognizance officer, but it's a series of yes-no simple questions. And Mr. Updike has been incarcerated at least ten times in the record and has filled out these questions all of those times without a question. Why was there paper given to write out something else? What they did was they printed out the questions, and he indicated yes or no on the form, and there's no evidence in the records to suggest that any of those yes-no questions were inaccurate. In fact, they were accurate and thorough. What if he had questions? What if he had questions about the process, and he asked for an ASL interpreter in order to give questions to the intake people? I don't understand if there's an ASL, if there are ASL services available, why it would be reasonable to deny them on their request. I just don't get your point. I think the answer is, I think guidance can be found in the case of Duval, the county of Kitsap, which is set in our briefs. To prevail under the ADA, the Duval court said that a plaintiff must show that the accommodations offered by the county were not reasonable and that he was unable to participate equally when receiving such a sheet. But that's not what the trial is for, is it? It can be. It's often important to address repeatedly, but this is often a fact to speak. But in this case, we have to clean out those questions. It's a series of questions. There's no front that's actually in development required. Counsel, if a deaf person was arrested and taken to the detention center tonight for procedures, and they asked for an ASL interpreter, would they? It sounds to me like you're saying, but they wouldn't give it to you. They would get a piece of paper and a pencil, give it to you. No, Your Honor. I think the record is replete with evidence that the Multnomah County Detention Center has a contract with ASL interpreting services, as well as at least four employees who are fluent in ASL. So when the circumstances do call for it, for example, for somebody who is illiterate, then that would be the appropriate measure. But for a series of simple yes or no questions, things like, have you been in the hospital in the last 24 hours, for somebody who can read English, even if it's not their preferred accommodation, that is definitive. And do you think that the detention center is just taking that approach to save the money of paying the ASL company? No, Your Honor. I think in this case there's a state in the record as to whether that request was made. But I think generally an analogy might be if a person who is impaired with mobility had a wheelchair and attempted to access a building that was a few feet off the ground, there was a ramp provided, and that person preferred an elevator and requested an elevator. If he's able to traverse the steps with the ramp, is the county required to build an elevator? The difficulty with your position with me is that you don't know how, whether or not the individual would have questions. Your client sees these as yes or no questions, but oftentimes people want a clarification before they answer yes or no. And that wouldn't be possible without the interpreter. And it just seems to me that the officials are making the decision as to whether or not a KSL interpreter is needed unnecessarily. If one is requested, to me, the more important course of action is to provide it rather than taking the chance that you've denied it arbitrarily. Your Honor, I would agree with that. But I think there is the law requires that the communication is effective. And in order to meet the deliberate and different standards, they would have to believe that the communication was not effective. And in this case, there's ample evidence that every question was answered accurately. And I see that my time is up. I want to make sure that Mr. Shah has time. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. I'm going to be a piece of court. Kenneth Shaw, the Oregon Judicial Department. As I understand, Mr. Alpex, claims to exist a delayed providing a KSL interpreter for his arraignment on Monday play. But the state doesn't tell us. It doesn't have that claim. It can say no knowledge, no access to that knowledge. And Mr. Alpex, even the interpreter, I think, did not willfully seek to avoid that information. Does the amendment bar any damages against the state? It's my understanding that, and this is not a memory thing, but the same question occurred to me, that the United States Supreme Court has held that the Congress value of the aggregated sovereign immunity would be held to the NDA. And that's a case called Tennessee D-Lane 541 U.S. 509. And these status claims arise from access to courts. Well, it was my understanding that the injunctive relief was more what was sought against the state as opposed to damages. And if the injunctive relief is not available, I thought the 11th Amendment would preclude any compensatory damages.  It's my understanding that the U.S. Supreme Court has held that the value of the NDA is a valid aggregation of sovereign immunity. Under the 14th Amendment, do these status claims arise from inadequate access to courts? So you're saying there are money damages available against the state? They could be. But that would not be in this record. No, that would not be in this record.  Yes. That's my understanding, Your Honor. You're arguing that the state didn't really have reason to believe that a pick needed an ASO interpreter. It was initially until he asked. That's correct, Your Honor. It's only a period in court. Correct. And there's no argument in this. It kind of is a point, at least in a kind of a frankness, suggesting that they're roughly ignoring this. You know, this isn't law-submit languages. You know, we didn't know about this. We had no actual knowledge until the period of court. And so we didn't know that there was going to be a problem until the period of court. And I understand you're really afraid the ASO interpreter would not take it down. Well, what are you saying is there's no evidence in the record here of showing a deliberate indifference on the part of any state actor? There's no evidence to support the inference of deliberately indifferent conduct. There's no evidence to support the fact that it's not required for damages. And the state group, too, denies ASO interpreters. It's not required for inference. There's no evidence to support that finding. And so, really, I think we just rely on the cases that differentiate between bureaucratic slippage, rely on the cases from this court that talks about bureaucratic slippage being just negligence and not actionable. If there's an inequal difference between bureaucratic slippage and deliberate indifference in this case, aren't they a false feeling on the side of bureaucratic slippage? And if the court has no further questions, we ask you to go for it. Any questions at all? No questions here. Thank you. All right. Thank you. Thank you. Thank you, Your Honor. I think we're out of time. If I could just make two points. We'll give you a minute. Okay. Thank you. The first is, in the record, page 86, the reconnaissance officer testified that he talked to Mr. Updike for 20 minutes about whether or not the deciding factor for whether or not to release Updike. That's not a simple conversation. That's a conversation where he even made note in his notes that for the hearing, he would require an ASO interpreter. So he knew he required an ASO interpreter to assess important issues like this, but did it provide him one for a 20-minute conversation? Well, opposing counsel says these were all yes-no questions. I'm not sure whether that's in the record on the reconnaissance forum. It was a 20-minute conversation. That doesn't sound like to any Mr. Updike, a forum that you check yes or no on it. And then the other thing is, regarding the state's comment there at the end, we did allege a pattern and practice. The clerk admitted, the administrator admitted that they did this information on a forum from the jail and that they ignore it, and they just let the court decide. That's insane. They ignore it. You mean, as a matter of routine, in most cases, they ignore it? They always ignore it. But those are the county defendants, right? No, those are the court staff that would be in charge of getting the information. Are they employees of the state? They're not employees of the state. Thank you. All right. Thank you. Thank you to all counsel. It's just argued it's admitted for a decision by the court, and we are on recess until 9.30 a.m. tomorrow morning.
judges: Tashima, Gould, Rawlinson